**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 14, 2021

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 14, 2021

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re the Matter of the Recall Charges Against Benton County Sheriff,<br><br>GERALD D. HATCHER,<br><br>Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 98968-1<br><br>En Banc<br><br>Filed: January 14, 2021 |

WHITENER, J.—On November 6, 2020, we entered a unanimous order affirming the superior court's decision to allow the recall effort against Benton County Sheriff Gerald Hatcher to proceed. We now take the opportunity to explain our decision in detail.

Sergeant Jason Erickson filed the petition to recall Sheriff Hatcher after 90 percent of the Benton County Deputy Sheriff's Guild (Guild) met and unanimously voted to pursue recall. The recall petition alleges 26 separate charges that, assuming, as we must, the truth of the allegations, illustrate a toxic and authoritarian culture that Sheriff Hatcher has created since his appointment in

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

2017. The Benton County Prosecutor's Office (BCPO) has categorized the 26 allegations into 8 charges for the purposes of the ballot synopsis. The superior court found all charges to be legally and factually sufficient. Sheriff Hatcher appeals this determination as to all charges.

We affirm the superior court and find all of the charges to be legally and factually sufficient. We look at each allegation in the context of the approximately nine-month period at issue, Sheriff Hatcher's experience in law enforcement, and the culture of control he has created within his department as alleged by the recall petitioner. Assuming, as we must, that the allegations are true, they identify recallable offenses.

## FACTS AND PROCEDURAL HISTORY

Sheriff Hatcher has been in law enforcement for approximately 27 years. He began as a deputy in the Benton County Sheriff's Office (BCSO) and rose to the rank of undersheriff. He has been the sheriff since May 16, 2017 when he was appointed by the Benton County commissioners. He then ran for election unopposed in 2018.

During his short reign as sheriff, Sheriff Hatcher has created a culture of control that has led to a hostile work environment for many, if not all, of his employees. The recall allegations mainly concern two specific administrative complaints against Sheriff Hatcher; however, the declarations provided show the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

breadth of the concerning behavior. The sheriff's behavior from October 2019 through June 2020 has given rise to 26 separate allegations of misfeasance, malfeasance, and/or violations of his oath of office. *See* Clerk's Papers (CP) at 49-62.

In October 2019, the Guild held a vote of no confidence and a large volume of the members voted that they had no confidence in Sheriff Hatcher. The Guild generated a letter that urged Sheriff Hatcher to resign because of domestic violence and witness tampering charges filed against him. These charges were later dismissed without prejudice.

On January 30, 2020, BCSO Lieutenant Erik Magnuson filed a report of harassment against Sheriff Hatcher, alleging that the sheriff constantly threatens his livelihood, interferes with his ability to express support through personal social media to guild members and corrections department employees, makes offensive comments about his religious beliefs, and has made threats of violence to him.

On or about January 31, 2020, the Guild wrote another letter expressing no confidence in Sheriff Hatcher. The media published the letter on February 2, 2020. The published letter informed Sheriff Hatcher "that after an overwhelming vote of our members, we can no longer support you, Jerry Hatcher, as our Sheriff." *Id*. at 286-87. The Guild indicated that it had brought concerns to Sheriff Hatcher and that he chose not to make changes. The Guild also expressed members' fear of retaliation and intimidation for speaking out. The Guild detailed how the BCSO was once "well

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

respected in the region and across the state." *Id*. at 287. But the letter turns to the culture under Sheriff Hatcher. It reads,

> You have been our Sheriff for less than two years. During this short amount of time, you have destroyed the positive culture within our organization and developed a culture that can only be described as hostile and negative. We can best define you as a Tyrant. You exercise your power similar to that of an oppressive dictator. Deputies and supervisors are frustrated, and deeply saddened by your lack of both leadership and professionalism. The atmosphere in the office can only be described as depressing, stressful, and plagued with heavy negativity.
>
> The unprofessional and dehumanizing method in which you treat personnel at our Sheriff's Office has continued and become increasingly worse to the point that several tenured members of our Guild and other staff have recently retired or sought other employment earlier than they wanted. We no longer have police officers wanting to lateral to our agency like in the past. Several deputies are currently looking into the possibility of leaving Benton County. Our agency has some of the best and highly experienced law enforcement officers in the area, and we are in real jeopardy of losing them.

*Id*. at 287-88. The letter goes on to detail Sheriff Hatcher's selfishness where he has placed personal benefit above the job and describes the allegations that have been leveraged against him.

On July 20, 2020, Sergeant Erickson served a "Request for Adjudication to Petition for Recall" on the Benton County auditor. He filed an amended request two days later, to fix typographical and date errors. The petition consists of 26 distinct allegations. The amended petition was served on Sheriff Hatcher on July 27, 2020. It

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

was transmitted to the Benton County prosecuting attorney the same day. The BCPO

prepared a memorandum of law and ballot synopsis and submitted the recall petition

and petition for approval of the ballot synopsis on July 31, 2020.

The ballot synopsis breaks down the 26 allegations into 8 distinct charges,

alleging that Sheriff Hatcher:

1. Illegally appropriated for his own use 14 cases of ammunition belonging to Benton County.

2. Illegally tampered with physical evidence by directing the distribution of ammunition that was potential evidence of his own alleged unlawful acts.

3. Interfered in an investigation into his conduct by acting to prevent witnesses from being interviewed.

4. Violated county anti-discrimination policy by hindering an investigation into his conduct and retaliating against the complainant and witnesses to the investigation.

5. Illegally intimidated public servants and witnesses in investigations into his conduct by raising false allegations of impropriety and threatening witnesses' jobs.

6. Illegally made false or misleading statements to law enforcement and the court regarding the number of firearms he needed to surrender pursuant to a court order.

7. Illegally made false or misleading statements to public servants claiming that he had initiated a criminal investigation into his own conduct when he had not.

8. Falsified a public record by placing a false date on an investigation request.

*Id*. at 587. Each category is addressed separately in the analysis.

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The trial court found all charges to be legally and factually sufficient and approved the ballot synopsis. Sheriff Hatcher appealed. At this court, Sergeant Erickson filed a motion to strike part of Sheriff Hatcher's reply brief. This motion has been passed to the merits.

Due to the numerous allegations made against Sheriff Hatcher, and to reduce excessive repetition of overlapping facts, more facts will be developed within the analysis section of this opinion.

## ANALYSIS

In Washington, an elected official may be subject to a recall if he or she "has committed some act or acts of malfeasance or misfeasance while in office, or . . . has violated his oath of office." WASH. CONST. art. I, § 33; *see also* RCW 29A.56.110. For the purposes of a recall,

> (1) "Misfeasance" or "malfeasance" in office means any wrongful conduct that affects, interrupts, or interferes with the performance of official duty;
> (a) Additionally, "misfeasance" in office means the performance of a duty in an improper manner; and
> (b) Additionally, "malfeasance" in office means the commission of an unlawful act;
> (2) "Violation of the oath of office" means the neglect or knowing failure by an elective public officer to perform faithfully a duty imposed by law.

RCW 29A.56.110.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

The legislature has chosen to limit the recall process "so that public officials will be protected from petitions based on frivolous or unsubstantiated charges." *In re Recall of Kast*, 144 Wn.2d 807, 813, 31 P.3d 677 (2001).

This court reviews the sufficiency of a recall petition de novo. *In re Recall of Wasson*, 149 Wn.2d 787, 791, 72 P.3d 170 (2003). We read the recall petition broadly, as a whole, and in favor of the voter. *In re Recall of West*, 155 Wn.2d 659, 666, 121 P.3d 1190 (2005). Although the court must not assess the truthfulness of the allegations contained within a recall petition, its function is to evaluate whether the allegations are both factually and legally sufficient. *Kast*, 144 Wn.2d at 813; RCW 29A.56.140.

"Factually sufficient means the petitioner has alleged facts that establish a prima facie case of misfeasance, malfeasance, or violation of the oath of office." *In re Recall of Ackerson*, 143 Wn.2d 366, 371, 20 P.3d 930 (2001). "The charges as a whole must identify to the electors and to the official being recalled acts or omissions that without justification support recall." *Id.* The facts alleged must be concise but detailed and must include specific information regarding the date, location, and nature of the allegation. *Wasson*, 149 Wn.2d at 791; RCW 29A.56.110. Although the recall petitioner need not have firsthand knowledge of an allegation, the recall petitioner must have some knowledge of the allegations that is more than a belief the charges are true. *Ackerson*, 143 Wn.2d at 372. "[W]e may consider supporting

7

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

documentation to determine whether the charges are factually sufficient." *West*, 155

Wn.2d at 663.

"When an official is accused of a crime, the recall petitioner must have

*knowledge* of facts indicating *intent* to violate the law." *Ackerson*, 143 Wn.2d at 373.

Intent to violate a law may be inferred from the circumstances, but may not be "'too

conjectural.'" *In re Recall of Heiberg*, 171 Wn.2d 771, 778, 257 P.3d 565 (2011)

(quoting *Ackerson*, 143 Wn.2d at 373).

In addition to factual sufficiency, the petitioner must show legal sufficiency.

"Legal sufficiency means the charge must define substantial conduct clearly

amounting to misfeasance, malfeasance or a violation of the oath of office." *Wasson*,

149 Wn.2d at 791. If an official has a legally cognizable justification for the conduct,

the recall petition is insufficient. *In re Recall of Wade*, 115 Wn.2d 544, 549, 799 P.2d

1179 (1990). Further, an official may not be recalled for discretionary acts, "unless

that discretion was exercised in a manifestly unreasonable manner." *Id.*

Each category of charge will be addressed for factual and legal sufficiency in

the order they appear on the ballot synopsis.

1. *Illegally appropriated for his own use 14 cases of ammunition belonging to Benton County (petition charge 4)*

Sergeant Erickson alleges that Sheriff Hatcher violated RCW 40.16.020 by

holding 14 cases (over 13,000 rounds) of ammunition at his private residence. Under

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

RCW 40.16.020 it is a gross misdemeanor to "fraudulently appropriate to the officer's own use or to the use of another person, or secrete with intent to appropriate to such use, any money, evidence of debt or other property intrusted to the officer by virtue of the officer's office."

The relevant facts for this allegation are as follows. On January 13, 2020, officers went to Monica Hatcher's house to obtain Sheriff Hatcher's firearms pursuant to the order to surrender that accompanied the domestic violence protection order (DVPO) protecting Ms. Hatcher from Sheriff Hatcher. In addition to 10 firearms, the Kennewick Police Department (KPD) found approximately 14 cases of ammunition (about 13,700 rounds) belonging to BCSO. At this time, pursuant to the order to surrender weapons, Sheriff Hatcher was not to be in possession of firearms or other dangerous weapons. Sheriff Hatcher claims the ammunition was "practice" ammunition. CP at 84.

According to Detective Todd Carlson, who distributes practice ammunition, he distributes the practice ammunition in quantities of 150-200 rounds for the purpose of practicing, but not stockpiling. He issues "Duty" ammunition for the SWAT (special weapons and tactics) teams in 50 round increments. *Id*. at 98. When he saw the ammunition inventories from Sheriff Hatcher's home he was "taken aback" as he understood it to be 14 *boxes* and not 14 *cases*. *Id*. at 99.

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

In Detective Carlson's declaration, he includes a table that details the

ammunition Sheriff Hatcher possessed:

| # | Ammunition | Case(s) |
|---|---|---|
| 1. | 308 Caliber | 2 cases (SWAT Duty ammunition)<br>1 case of .308 Tap ammo<br>10 boxes / 20 rounds per box= 200 rounds<br>1 case of .308 Win American Eagle<br>25 boxes / 20 rounds per box= 500 rounds |
| 2. | .223 Caliber | 6 cases which compromise [sic] of 5 full cases<br>and 1 case with 21 boxes out of 25.<br>A complete case +equals 25 boxes total |
| 3. | .40 caliber | 4 Cases<br>1000 rounds per case |
| 4. | 9mm | 1 Case<br>1000 rounds per case |
| 5. | 22 caliber LR | 1 Case (50 boxes / 100 rounds per box) |

*Id*. at 100-01.

According to records, Sheriff Hatcher was assigned a ".40 caliber pistol and a

.223 caliber rifle (NFA) and a 12-gauge shotgun." *Id*. at 99. This means that Sheriff

Hatcher was in possession of BCSO ammunition that was not compatible with his

department-issued firearms (though some were compatible with his personal

firearms). This included specific ammunition that was only for SWAT team members

when Sheriff Hatcher has never been a member of the SWAT team. Further, the

location of the ammunition was not readily accessible by members of the BCSO, and

Sheriff Hatcher made no effort to notify anyone of the location of the ammunition,

even when he could no longer legally possess firearms.

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

Multiple officers indicate in their declarations that the amount of ammunition greatly exceeded what an officer would use for practice, and there is no reason for an officer to have ammunition for a caliber of weapon not assigned by the BCSO.

In his declaration, former BCSO Commander Tom Croskrey stated that he was "shocked" by the volume of ammunition, that the .308 caliber ammunition is not "practice" ammunition (as it is intended for the SWAT team, and they do not use "practice" ammunition), and that having cases (instead of boxes) of ammunition was "troubling." *Id*. at 92.

In his declaration, Commander Jon Law states that the amount of ammunition that Sheriff Hatcher had at his home was "astronomical" and "would never be distributed in this amount to anyone unless there was a specific reason stated in advance." *Id*. at 68. Further, he states,

> Possessing ammunition for "practice" for calibers of weapons not currently assigned to a member of the office in this quantity is not reasonable. Possessing ammunition in "case" quantities for "practice" ammunition defies reason. The purpose of "Practice" ammunition generally is to use the ammunition for weapons you are assigned in order to be proficient in the use of the weapon. If you are not assigned a .308 caliber weapon by Benton County, there is no reasonable need for the county to pay for an employee to practice with this ammunition. This conclusion also applies to the 9mm and the .22 caliber ammunition.

*Id*. at 68-69. Commander Law indicates that he himself had an above average quantity of practice ammunition at less than 500 rounds. *Id*. at 69.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In his declaration, retired BCSO Detective Lee Cantu states that in his decades of experience, he has rarely seen practice ammunition distributed by a case. *Id*. at 84. He states that it was "highly questionable" for Sheriff Hatcher to have that much ammunition in his possession, especially when it came from one specific invoice order. *Id*. Further, he states,

> In indicating "highly questionable" above it is my opinion that if a person associated with the Benton County Sheriff's Department, regardless of rank, had in their possession and control, thousands of practice ammunition that derived from a single invoice order, it would be presumptive evidence of criminal activity in the absence of a very specific justification.

*Id*.

If the recall petitioners convince the voters that these facts are true, then the voters could certainly conclude that Sheriff Hatcher violated RCW 40.16.020 when he stored over 13,000 rounds of ammunition in his home without reasonable justification as it was an exorbitant amount of ammunition to possess as "practice ammunition" and some of the ammunition did not match the calibers of his department-issued weapons.

In contrast with other elected officials, the elected sheriff possesses law enforcement duties that are inherently affected when he or she commits a crime. As the elected sheriff, Sheriff Hatcher took an oath to "support the laws of the State of Washington." *Id*. at 49. Under RCW 36.28.010(1), the sheriff "[s]hall arrest and

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

commit to prison all persons who break the peace, or attempt to break it, and all persons guilty of public offenses." Further, under RCW 36.28.011, "[i]n addition to the duties contained in RCW 36.28.010, it shall be the duty of all sheriffs to make complaint of all violations of the criminal law, which shall come to their knowledge, within their respective jurisdictions." Therefore, the sheriff who violates the law puts himself in a position where he must choose between serving his constituents through his law enforcement duties or acting within his own self-interest. Accordingly, a sheriff's actions in violation of RCW 40.16.020, 36.28.010, and 36.28.011, clearly amount to both misfeasance and malfeasance under RCW 29A.56.110.

Sheriff Hatcher claims that because the operating procedures provide no limits as to the amount of practice rounds one may possess, he is within his discretion to store the ammunition at his house. However, the declarations of numerous officers indicate that the amount of ammunition possessed was highly unreasonable. The amount of ammunition in his possession, having ammunition that is incompatible with department-issued firearms (but compatible with his personal firearms), and the many officers' declarations all show that Sheriff Hatcher exercised his discretion in a manifestly unreasonable manner. His conduct affects and interferes with the performance of his duties as sheriff.

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

In addition, Sheriff Hatcher alleges, without authority, that the charge fails for legal sufficiency because the proper avenue for criminal law is the criminal process.[1] An elected official need not be charged and found guilty of a crime prior to a recall on said allegations. As alleged by the recall petitioner, Sheriff Hatcher's acts rise to the level of a knowing and intentional violation of criminal law. Therefore, the recall petitioner has established a prima facie case that Sheriff Hatcher committed misfeasance or malfeasance without any legal justification.

> 2. *Illegally tampered with physical evidence by directing the distribution of ammunition that was potential evidence of his own alleged unlawful acts (petition charges 5 and 6)*

Sergeant Erickson alleges that Sheriff Hatcher violated RCW 9A.72.150 by soliciting another officer to redistribute evidence and violated RCW 9A.80.010 by committing an unauthorized act without color of law. Under RCW 9A.72.150,

> (1) A person is guilty of tampering with physical evidence if, having reason to believe that an official proceeding is pending or about to be instituted and acting without legal right or authority, he or she:
> (a) Destroys, mutilates, conceals, removes, or alters physical evidence with intent to impair its appearance, character, or availability in such pending or prospective official proceeding.

Further, under RCW 9A.80.010,

> (1) A public servant is guilty of official misconduct if, with intent to obtain a benefit or to deprive another person of a lawful right or privilege:

---

[1] Sheriff Hatcher makes similar criminal process arguments as to many of the charges, but we do not recount it each time.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

        (a) He or she intentionally commits an unauthorized act under color of law.

On January 13, 2020, KPD executed the order to surrender firearms at Ms. Hatcher's house. According to the recall petitioners, KPD then met with BCSO Commander Steve Caughey to return the BCSO property. Based on Commander Caughey's interaction with KPD he documented the event because "the sheer volume of ammunition could be evidence of a crime." CP at 158. Shortly thereafter Sheriff Hatcher asked Commander Caughey to redistribute the ammunition. Commander Caughey did not redistribute the ammunition as he believed this would "chang[e] the nature and character" of the evidence. *Id*. at 159. This alone would constitute a violation of RCW 9A.72.150.

But the proponents of recall allege that Sheriff Hatcher was not finished attempting to tamper with evidence. On February 14, 2020, immediately after Sheriff Hatcher met with Sergeant Erickson and agreed to conduct a criminal and administrative investigation into the ammunition,[2] he asked Commander Caughey about the status of the redistribution of ammunition. Commander Caughey told him that he had not done so. Sheriff Hatcher told Commander Caughey to follow through with the original request, but Commander Caughey expressed his concern given the possibility that it was evidence of a crime.

---

[2] The circumstances surrounding this conversation are discussed in detail in Part 3.

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

There is a reasonable inference that Sheriff Hatcher both knowingly and intentionally violated the law. This court looked at the "intent to violate the law" requirement in *In re Recall of Pearsall-Stipek*, 141 Wn.2d 756, 10 P.3d 1034 (2000). In that case, the recall petitioner alleged that Pearsall-Stipek had committed multiple acts of false swearing. The court held that when Pearsall-Stipek misstated the dates she attended college, it was insufficient to show that she intended to violate the law. *Pearsall-Stipek*, 141 Wn.2d at 779. However, in another trial, on the transcript page after she swore her oath, she falsely testified that she had received a college degree. *Id*. The court held that the untruthfulness so soon after her oath was sufficient to show she intended to violate the law. *Id*. Much like *Pearsall-Stipek*, where the elected official had just been reminded of the law against false swearing, Sheriff Hatcher had just come out of a meeting with Sergeant Erickson and Commander Croskrey in which he agreed to investigate the very ammunition he sought to have redistributed.

Sheriff Hatcher argues that the redistribution of ammunition was a discretionary act because the ammunition was inventoried before he chose to redistribute. However, Sheriff Hatcher abused his position as sheriff for his personal benefit by asking a subordinate to redistribute potential evidence, which would alter the character of the physical evidence, for an investigation he had just agreed to begin. His conduct is manifestly unreasonable and is an abuse of

16

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher,*
No. 98968-1

discretion. Further, voters could find that Sheriff Hatcher violated his oath of office when he chose his self-interest over his oath and committed misfeasance and malfeasance in the performance of his duty as a sheriff when he violated the law and attempted to alter the physical evidence by having the ammunition redistributed.

3. *Interfered in an investigation into his conduct by acting to prevent witnesses from being interviewed (petition charges 11 and 12)*

This ballot synopsis charge, and the next, require a bit of context into two complaints that have been filed against Sheriff Hatcher and the subsequent investigations of those complaints. At numerous times during the investigations, Sheriff Hatcher committed malfeasance and/or misfeasance in the performance of his official duties.

In the midst of the allegations surrounding the stockpiling of ammunition, at the end of January 2020, Lieutenant Magnuson filed a complaint against Sheriff Hatcher for violating the 2008 "Benton County Equal Employment Opportunity/ Anti-Discrimination and Harassment Policy and Complaint Procedure" ("Anti-Discrimination Policy" or "policy"). The circumstances surrounding the investigation of these claims led to petition charges for other violations of the policy, intimidating witnesses, intimidating public servants, and retaliating against witnesses.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

On February 14, 2020, parallel events occurred within both investigations. At approximately 6:56 a.m. Sergeant Erickson e-mailed a letter of resignation to Sheriff Hatcher, informing Sheriff Hatcher of his intent to resign and his wish to self-demote from lieutenant to sergeant. At around 7:40 a.m., he met with Sheriff Hatcher and provided him with a paper copy of the resignation/demotion letter. Sergeant Erickson told the sheriff it was because of the facts surrounding the firearms and ammunition and "the totality of the facts and circumstances caused [him] considerable stress, concern, and anxiety to the extent that [he] was no longer able to serve in [his] capacity as a [lieutenant]." CP at 21. Sergeant Erickson explains that he made this decision because of Sheriff Hatcher's refusal (despite repeated requests) to have an independent investigation of the domestic violence allegations, his repeated statements that a "'small nucleus'" of guild members voted no confidence (when, in fact, it was a majority of members), and the later discovery of the stockpile of ammunition. *Id*. at 105-07. The meeting was brief.

Around the noon hour, Sheriff Hatcher had BCSO Commander Croskrey summon Sergeant Erickson to return to work to discuss the resignation letter. During this meeting, Sergeant Erickson did not want to answer questions, but Sheriff Hatcher told him he would be subject to discipline up to termination if he did not. Sergeant Erickson then requested the presence of his attorney, Alan Harvey. Sheriff Hatcher initially refused and then gave him a "short amount of

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

time to produce [his] attorney." *Id*. at 115. After Mr. Harvey arrived, Sheriff

Hatcher ordered Sergeant Erickson to undergo questioning. Sheriff Hatcher was

informed that Sergeant Erickson was a whistleblower in regards to the sheriff's

actions, but he proceeded with questioning anyway. At the end of the interview,

Sheriff Hatcher indicated that he would be initiating a criminal investigation and

an administrative review with the Franklin County Sheriff's Office (FCSO) into

the ammunition. In his request for the FCSO to conduct the investigation, Sheriff

Hatcher told Sheriff Jim Raymond, "If the Review turns towards any wrongdoing,

I would request you contact me immediately and I will have you forward the

information to the appropriate agency or authority." *Id*. at 324.

Regarding the investigation of the ammunition, Sheriff Hatcher told

Commander Croskrey that the commander was going to be the liaison with the

FCSO for the purposes of the investigation. However, according to Commander

Croskrey, during the FCSO investigation he saw Sheriff Hatcher "obstruct his own

investigation and secretly change the course of the investigation." *Id*. at 94.

Commander Croskrey explained that after his first interaction with the two FCSO

captains investigating the matter, Sheriff Hatcher asked the commander about the

interaction and when told the conversation was several hours long, he appeared

annoyed with the length of the interaction and "expressed concern and his

dissatisfaction with me about the amount of time." *Id*. at 92. In subsequent

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

interactions, Sheriff Hatcher inserted himself into the investigative process, even telling Commander Croskrey that the investigating officers would need to contact him, Sheriff Hatcher, directly for access to some of the information.

Other officers also expressed concerns about interference and retaliation involving Sheriff Hatcher during the ammunition investigation. Commander Caughey, in his declaration, indicates that when interviewed by the captains in relation to the ammunition investigation, he expressed that he "had never seen an administrative investigation commence with no companion criminal investigation when the allegations related to potential criminal conduct." *Id*. at 162. He stated that this was not a practice he was familiar with, that he thought it would negatively impact any criminal investigation, and that he was concerned about retaliation from the sheriff based on his answers in the interview.

At the close of the FCSO ammunition investigation, one captain informed Commander Croskrey that "there appeared to be probable cause on a number of criminal acts with respect to Sheriff Hatcher." *Id*. at 94. Further in the captains' investigatory report they indicate, "Many of the issues raised had legal implications and would better support our final recommendation by Investigators to have this entire report reviewed by an Attorney or Prosecutor for guidance with appropriate feedback and/or referral." *Id*. at 571. These "issues" include allegations of intimidation of whistleblowers, criminal conduct, tampering with witnesses, and

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

a lack of objectivity in the investigation as Sheriff Raymond has been publicly supporting Sheriff Hatcher and is his political ally. *Id.* at 571-72.

Also on February 14, 2020, separate from Sergeant Erickson's accusations that day, the Benton County prosecutor appointed two special deputy prosecutors, Jeffrey J. Druckman and Janine C. Blatt, to conduct an independent investigation into Lieutenant Magnuson's harassment complaint. Ms. Blatt conducted the witness interviews and compiled the investigation report.

On March 19, 2020, she interviewed, in person, BCSO officers Lieutenant Magnuson, the complainant, and Lieutenant Mathew Clarke. Ms. Blatt was unable to interview Commander Law and Commander Caughey that day due to the sheriff's interference. That day, both Commander Law and Commander Caughey sought Sheriff Hatcher's permission to take the afternoon off to attend their interview with Ms. Blatt. When Sheriff Hatcher learned that their attorney would be attending, he told them they could be interviewed during work hours on duty if they agreed not to have an attorney present. Sheriff Hatcher told Commander Caughey that he would "'find out what these interviews state and if you are not going to defend me, I will take great exception to that, but this is not a threat.'" *Id.* at 186. He also told them that they *could* participate in the interview if "he could have a representative sit in on their interviews." *Id.* at 272-73. Sheriff Hatcher also

21

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

told Ms. Blatt, when contacted, that she could interview Commanders Law and

Caughey during work hours if they did not have an attorney present.

Retired BCSO Detective Cantu indicates in his declaration that to have a

"representative" for the sheriff sit in is "unprecedented at this stage of an

investigation." *Id*. at 86. He analogizes this to "having the suspect in a domestic

violence matter in the room when the victim is interviewed and/or the suspect

alleged to have committed crimes against a child present when the child is

interviewed." *Id*. at 86-87. He states, "Sheriff Hatcher's request is not just outside

'best practices' it is not practiced at all in my experience at this stage of any

internal or criminal investigations." *Id*. at 87.

Ms. Blatt was finally able to interview Commander Law and Commander

Caughey on April 13, 2020. Ms. Blatt interviewed Sheriff Hatcher by telephone on

April 7, 9, and 23.

According to Ms. Blatt's final report, Lieutenant Magnuson reported that the

Sheriff "constantly threatens his livelihood, interferes with his ability to express

support through personal social media of the members of his Guild and the

Corrections Department employees, makes offensive comments about his religious

beliefs, and has made threats of violence to him." *Id*. at 182.  This included the

sheriff telling Lieutenant Magnuson, "'If I could reach through this phone and

choke the life out of you, I would,'" and another incident of the sheriff threatening

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to strangle the lieutenant with his "hands out . . . in a choking motion." *Id*. Sheriff

Hatcher has also repeatedly told Lieutenant Magnuson not to get comfortable

because he can restructure Magnuson out of the department and that he is sheriff

and "no one can do anything to [him]." *Id*. at 183.

Lieutenant Magnuson told the sheriff he should resign because of Sheriff

Hatcher's own admission that he grabbed his wife by the neck during an argument.

Sheriff Hatcher accused Lieutenant Magnuson of judging him because of the

lieutenant's religious beliefs. Lieutenant Magnuson explained that he was judging

the sheriff based on department policy and that "he had deputies coming to him

crying because the public was treating them negatively because of the charges

against the Sheriff." *Id*. The sheriff then made comments about Christians being

"high and mighty" and judgmental. *Id*. Lieutenant Magnuson indicated he fears

"retaliation and worse due to the Sheriff's anger." *Id*. at 184. He told investigators

that the stress is interfering in his relationship with his family and that "he walks

around the office in tears at times and expressed that he deserves a safe place to

work." *Id*. at 184-85.

Lieutenant Clarke, during his interview with Ms. Blatt, also indicated that

"the Sheriff talks down to officers, does not give officers a chance to explain, takes

credit for successes that are not his, makes sure you know that he is in charge, back

stabs, and throws members of the command staff under the bus." *Id*. at 185. He

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

also told Ms. Blatt that the sheriff makes comments that the officers need counseling because they are "'soft'" and "'weak.'" *Id*. He also indicated that the sheriff has threatened his job through restructuring.

Ms. Blatt's investigation did not substantiate harassment or discrimination on the basis of religion, but it did substantiate harassment and retaliation based on union activity and affiliation. It concludes that Sheriff Hatcher has created "an intimidating and hostile work environment . . . ." *Id*. at 196-97. This hostile work environment was compounded by Sheriff Hatcher's attempt to control the narrative of the investigation through his wrongful conduct toward his employees. His conduct was wrongful and affected and interfered with the performance of his official duties.

As to ballot synopsis charge 3 specifically, Sergeant Erickson alleges that on or about March 19, 2020,[3] as discussed above, Sheriff Hatcher violated the Anti-Discrimination Policy when he prevented two witnesses (Commander Law and Commander Caughey) from interviewing with the investigator.

Under the policy,

> Benton County does not tolerate any retaliation against any person for opposing unlawful discrimination or harassment, making a discrimination or harassment complaint, or *participating in an investigation or complaint proceeding*. Prohibited conduct includes

---

[3] The recall petition reads March 9, 2020, however, the record appears to indicate this occurred on March 19, 2020. *See* CP at 72.

24

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> any adverse treatment that is based on a retaliatory motive and that is *reasonably likely to deter an individual from engaging in protected activity*.

*Id*. at 294 (emphasis added).

Here, Sheriff Hatcher's conduct is prima facie evidence of misfeasance and malfeasance. Through his attempt to control the interviews in this administrative investigation, he violated the Anti-Discrimination Policy by failing to perform faithfully the duty imposed on him by law. In *Kast*, this court found malfeasance for wrongful conduct when the violation of law, though it did not have a civil fine or criminal penalty, "'interfere[d] with the performance of official duty' by failing to promote the *best interests* of the fire district." 144 Wn.2d at 815-16 (alteration in original) (quoting former RCW 29.82.010(1) (1984)). Here, by interfering with the investigatory interviews and by placing restrictions on the interview process that were likely to affect participation in the interviews, the sheriff failed to promote the best interests of his police department.

Sergeant Erickson analogizes the Anti-Discrimination Policy charges in this case to *In re Recall of Washam*, 171 Wn.2d 503, 257 P.3d 513 (2011). In that case, the court found five charges regarding an elected official's violations of county ordinances to be legally and factually sufficient. Those relevant to the present case are retaliation against an employee for filing a complaint against the official; failure to protect an employee from "retaliation, false accusations or future

improper treatment"; and refusing to participate in the investigation. *Washam*, 171 Wn.2d at 516-20. Although the court did not specifically note the substantial conduct standard as to the allegations because we found the charges legally sufficient, it follows that noncompliance with investigatory procedures regarding a discrimination complaint rises to the level necessary to be substantial. Therefore, the *repeated* violations of an established antidiscrimination policy in this case are considered substantial conduct, both individually and as a pattern of behavior.

Sheriff Hatcher claims his interference with the interviews was a discretionary act. However, under the policy the elected official coordinates the investigation, *unless* the complaint is against the elected official, then the prosecuting attorney coordinates the investigation. Thus, the timing of the interviews was not under the purview of the sheriff. Even assuming it was the sheriff's responsibility, it is an abuse of his discretion to require his own representative to attend an investigatory meeting about him or to require his officers to use their leave time to participate in a work-related investigation.

4. *Violated county anti-discrimination policy by hindering an investigation into his conduct and retaliating against the complainant and witnesses to the investigation (petition charges 7, 13, 14, 19, 20, 23, 24, and 26)*

The following charges also stem from the complaint and interference with the investigation as discussed in the previous section. This section, however, addresses allegations about the lengths that Sheriff Hatcher went to in order to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

hinder the investigation into his discriminatory and retaliatory conduct toward his

employees.

(a) Charge 7: Protecting the Confidentiality of the Complaint

Recall petitioners allege that on February 4, 2020, after Sheriff Hatcher

learned that a complaint had been filed against him, he went out of his way to learn

the identity of the complainant. Sheriff Hatcher called Commander Caughey into

his office to discuss a recent guild letter. The sheriff asked Commander Caughey if

Lieutenant Magnuson "is the one poisoning the guild." CP at 168. Commander

Caughey told the sheriff to speak with Lieutenant Magnuson as he did not believe

he could or should be having the discussion as it could be a violation of county

policy and/or state law.

On February 5, 2020, the sheriff again insisted that Commander Caughey

tell him "about the issues Erik Magnuson has with him." *Id*. The commander tried

to avoid the question and told Sheriff Hatcher he was there to inform him of his

need to run to the county shops and that he did not want to discuss the issue for

fear of violating the Anti-Discrimination policy or state law. Sheriff Hatcher

insisted that Commander Caughey tell him what was going on and told him he

"had one more chance to tell him what the issues were with Erik." *Id.* According to

Commander Caughey, he took the words to mean that if he refused to answer the

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

sheriff's question that "I was facing discipline to include demotion or termination and that I had no choice but to provide the Sheriff with an answer." *Id.*

According to Commander Caughey, he told the sheriff that Lieutenant Magnuson had filed a complaint and again insisted the discussion could violate the policy or state law. Following this encounter, Commander Caughey documented this interaction in an e-mail to human resources. Later that same day, the sheriff held another meeting with Commander Law and Commander Caughey in which he repeatedly attempted to coerce the commanders into revealing the contents of the complaint. He also stressed loyalty and commitment to him and repeatedly referenced demoting and firing in relationship to loyalty to him. Commander Law linked these concepts to the complaint.

Under the policy,

[e]mployees are encouraged to report discrimination and harassment at the earliest possible time. Complaints may be made either verbally or in writing. Complaints are to be made in good faith. Benton County protects the confidentiality of discrimination and harassment complaints to the extent possible. If necessary, complaints may be made anonymously and will be investigated if sufficient information for an investigation is provided.

*Id*. at 293. Further, as indicated in ballot synopsis charge 3, any sort of retaliation, including adverse treatment that is likely to deter individuals from engaging in protected behaviors, is prohibited. This includes hostility toward complainants and participants.

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

Voters could certainly find that Sheriff Hatcher's conduct violated the BCSO's policy and, arguably, the law. Commander Caughey explicitly warned the sheriff that the conversation may be against the law or the policy, and a reasonable inference under *Pearsall-Stipek* is that Sheriff Hatcher thus intended to violate the policy. Sheriff Hatcher was the subject of the investigation, and he was not tasked with overseeing the investigation. Therefore, the constant badgering and attempts to gain information coupled with the clear threats of demotion, termination, or disciplinary action is a violation of his oath of office or misfeasance.

(b) Charges 13 and 14: Witness Interviews with a Representative

These charges present essentially the same facts and reasoning as ballot synopsis charge 3. The facts and analysis discussed in that section apply in full here.

(c) Charges 19, 20, 23, 24, 26: Retaliating against a Witness

Sergeant Erickson alleges that between February 2020 and June 2020, Sheriff Hatcher retaliated against witnesses (Commander Law, Commander Caughey, and Commander Croskrey) in violation of the Anti-Discrimination Policy on three different dates. The text of the policy provision at issue is quoted in ballot synopsis charge 3. The facts alleged establish that Sheriff Hatcher *repeatedly* retaliated against the commanders in his attempt to manipulate the testimony of the witnesses and the overall investigation.

29

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

The investigation conducted by Ms. Blatt found that Sheriff Hatcher

retaliated against Lieutenant Magnuson because of his union activity and suspected

involvement with the Guild's letters. The retaliatory behavior included making

negative comments to the lieutenant about his religious beliefs and excluding him

from command staff meetings because he was unwilling to support the sheriff and

was considered disloyal. It was well known to each member of his command staff

that the sheriff "will not tolerate 'disloyalty.'" *Id*. at 197. It was reasonable to

conclude that the sheriff's behavior was designed to intimidate and chill the

lieutenant's protected union activity and behavior.

Furthermore, the investigation showed that Sheriff Hatcher's retaliatory

behavior included acts toward Commander Law and Commander Caughey.  Ms.

Blatt found that after the sheriff learned that these two commanders were

witnesses, he began using sticky notes in meetings, allegedly to document negative

performance, and he warned the commanders that he would find out what they said

in the interview with her and would "take great exception to disloyalty." *Id*. at 197-

98. He informed them that they could not participate in the interviews on paid time

unless he could have a representative sit in on their interviews and informed them

that he too could "whistleblow." *Id*. at 198. Shortly thereafter, a false allegation

from 2017 surfaced in which he alleged that the commanders used county

ammunition improperly during a hunting trip.  Ms. Blatt "determined that the

30

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Sheriff's motive for raising this allegation now (and not in 2017) can be for *no*

*other purpose* than to retaliate against the witnesses for participating in an

investigation against him." *Id*. at 396 (emphasis added). She also found that "the

Sheriff's behavior is intended to damage the reputation of the witnesses (by raising

an allegation of impropriety) and to make the witnesses believe they will lose their

jobs or be demoted if they share any negative information about the Sheriff in this

investigation." *Id*.

However, the retaliatory behavior did not conclude when the formal

investigation was over. On May 7, 2020, Sheriff Hatcher held a meeting with

Commanders Law and Caughey, under the guise of discussing staffing, that ended

up lasting six-and-a-half hours. At this point Sheriff Hatcher knew that the

commanders were both witnesses in both investigations against the sheriff. Sheriff

Hatcher steered the conversation away from staffing and toward the investigations,

and he stated that "he was sick and tired of people blaming him for everything that

has happened over the last 6-8 months, and that both [commanders] are partially

responsible as well." *Id*. at 169. He also alleged that Commander Caughey was

dishonest. As to this interaction Commander Caughey states,

> I indicated that the accusation was not true. Sheriff Hatcher became
> angry and told me I better get that look off of my face and stop being
> disrespectful. I told him I was not being disrespectful to him. The
> Sheriff used his authority as my boss, he pointed his finger at me and

> said, "Say one more word." I said yes sir and nothing further as I felt
> if I did he would fire, demote or discipline me.

*Id*. at 169-70. Sheriff Hatcher then accused Commander Caughey of being disrespectful and informed him that the previous sheriff would have fired both of them for their disrespect.

Sheriff Hatcher then indicated that Lieutenant Magnuson was "stirring the pot" and that he would not tolerate it anymore. *Id*. at 170. He told the commanders that allowing them to form the Guild was a mistake and "has become his worst nightmare." *Id*. "Sheriff Hatcher said when the time comes for negotiations and language for our Collective Bargaining unit that he will be fighting tooth and nail on wording." *Id*.

The conversation turned to the investigation of the ammunition, and Sheriff Hatcher asked if Commander Caughey called him a "thief." *Id*. Commander Caughey replied he did not recall, but Sheriff Hatcher stated he "was 'going to know'" if this was truthful because he had the investigative binders. *Id*. at 170-71. Commander Caughey indicated that he was unsure how the sheriff could investigate himself. "Sheriff Hatcher became angry and said it is because it is the law, I had better read it and understand that it is in his authority as a sheriff to investigate any crime in Benton County, including those where he is the suspect."

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Id*. at 171. After back and forth about the ammunition, Sheriff Hatcher "said that [they] had better hope that [they] didn't say he stole the ammunition." *Id*. at 172.

Commander Law asked Sheriff Hatcher if he had told others about the commanders taking ammunition in 2017. Sheriff Hatcher stated he did not know they had taken the ammunition. Commander Law stated that was a lie as they had asked the sheriff for permission, and Sheriff Hatcher then said he did not know how much ammunition they had taken. Commander Law indicated Sheriff Hatcher knew they took the ammunition because he was supposed to go on the trip. The sheriff agreed but again stated he did not know how much ammunition they took. When asked if he told Detective Carlson, Sheriff Hatcher admitted he had. Commander Law indicated this did not make sense, as they had permission to take the ammunition for training. Sheriff Hatcher again agreed that they did have permission to take the ammunition on the trip.

Turning to Lieutenant Magnuson's complaint, Sheriff Hatcher stated that "it feels like this is all being used against him and he will know who has been loyal or not and there will be consequences." *Id*. at 173. He said that "he will not have a commander that is not committed to him and will not stand with him," and asked the commanders multiple times if they would stand by him. *Id*. The commanders did not reply. Sheriff Hatcher reiterated that they had to stand by him.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Commanders Law and Caughey both felt as though they could be demoted or fired if they had shared negative information in the investigations.

After this conversation, Sheriff Hatcher changed the structure of meetings within the office. Although for two years Sheriff Hatcher had met with Commanders Law and Caughey together, he initiated a "change in the meeting structure whereby [Commander] Law and [Commander Caughey] do not meet with Sheriff Hatcher at the same time." *Id*. at 174-75. Commander Caughey stated that this creates additional work for the commanders to coordinate related to their duties.

Finally, on June 23, 2020, Sheriff Hatcher, on live radio, made false accusations that recently retired Commander Croskrey had issues related to his time cards. The facts surrounding this allegation date back to November 2019. At that time, Commander Croskrey was in charge of the BCSO for two weeks due to the domestic violence allegations against Sheriff Hatcher. Given the nature of the allegations, Commander Croskrey handled Ms. Hatcher's case and created the domestic violence safety plan. When Sheriff Hatcher returned from his leave, he told Commander Croskrey "'When I find out who's talking to my wife, they're through!'" *Id*. at 90. Although it was policy for Commander Croskrey to create the plan, he believed that his employment was at risk because he was an "at will"

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher,*
No. 98968-1

employee and "Sheriff Hatcher is consumed with hostility, anger, and engages in the use of deception and lies when he sees the need for such action." *Id.*

Around this time, Sheriff Hatcher was angry about the Guild writing public letters indicating they did not support the sheriff. Sheriff Hatcher threatened to interview all the deputies and make them "'Brady cops.'"[4] *Id.* at 94. This was especially concerning to Commander Croskrey as his son is a deputy, and he believed it to be a threat to both of their jobs. After one conversation in which Sheriff Hatcher told Commander Croskrey that he was going to investigate the commander's son, "for what appeared to be no reason," Sheriff Hatcher asked Commander Croskrey "to call the Tri-City Herald and give them a positive supporting for him." *Id.* at 95.

In June 2020, Commander Croskrey submitted his resignation. As part of the resignation process, there was follow-up regarding a whistleblower complaint with human resources about Sheriff Hatcher's unethical and unlawful behaviors. Also during this process, human resources found no issues relating to Commander Croskrey's time cards. This culminated in Sheriff Hatcher, on live radio, accusing Commander Croskrey of having "issues relating to [his] use of time." *Id.* at 200.

---

[4] *See Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *see also* Jonathan Abel, Brady*'s Blind Spot: Impeachment Evidence in Police Personnel Files and the Battle Splitting the Prosecution Team,* 67 STAN. L. REV. 743, 746-47 (2015).

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

These allegations are extremely concerning and establish an ongoing pattern of threatening and retaliatory behaviors showing the hostile work environment that Sheriff Hatcher created. Sheriff Hatcher attempts to explain away his retaliatory behavior, arguing that conduct that "may" deter one from participating in protected activity is insufficient. He states that it must *actually* deter them. To the contrary, the policy indicates it is a violation if the behavior is "reasonably likely to deter," not that it *must* deter. *Id*. at 255. The extensive threats, false accusations, and negative remarks are *reasonably likely* to deter witnesses and complainants from engaging in protected activity. Thus, his behavior is a violation of the policy and amounts to misfeasance and a violation of his oath of office.

> *5. Illegally intimidated public servants and witnesses in investigations into his conduct by raising false allegations of impropriety and threatening witnesses' jobs (petition charges 15, 16, 17, 18, 21, 22, and 25)*

(a) Charges 15, 16, 17, and 18: April 7, 2020 Accusation

On April 7, 2020, Sheriff Hatcher had a meeting with Detective Carlson to discuss the "'firearms program.'" *Id*. at 101-02. Detective Carlson had never met with Sheriff Hatcher in a private meeting before. *Id*. at 102. In the meeting, Sheriff Hatcher told Detective Carlson that in 2017, Commanders Law and Caughey had used county ammunition to go on a hunting trip and hunt squirrels. Sheriff Hatcher did not tell Detective Carlson that he had authorized the use of the ammunition for the trip. Detective Carlson was "surprised" that Sheriff Hatcher was discussing the

36

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

ammunition use by two material witnesses in the investigations in which Sheriff Hatcher was the suspect. *Id.* During the investigation, Sheriff Hatcher told Ms. Blatt that he had not approved the use of the ammunition for the trip. This was a misleading statement as he later confirmed that he had approved the taking and use of the county ammunition for training on the trip.

Sergeant Erickson alleges this amounts to intimidating witnesses under RCW 9A.72.110 and intimidating public servants under RCW 9A.76.180.

Under RCW 9A.72.110,

> (1) A person is guilty of intimidating a witness if a person, by use of a threat against a current or prospective witness, attempts to:
> 　　(a) Influence the testimony of that person;
> 　　. . . .
> 　　(3) As used in this section:
> 　　. . . .
> 　　(b) "Current or prospective witness" means:
> 　　(i) A person endorsed as a witness in an official proceeding;
> 　　(ii) A person whom the actor believes may be called as a witness in any official proceeding.

Under RCW 9A.76.180(1), "[a] person is guilty of intimidating a public servant if, by use of a threat, he or she attempts to influence a public servant's vote, opinion, decision, or other official action as a public servant." Both sections use the definition of "threat" from RCW 9A.04.110(28),

> "Threat" means to communicate, directly or indirectly the intent:
> 　　. . . .
> 　　(d) To accuse any person of a crime or cause criminal charges to be instituted against any person; or

37

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher,*
No. 98968-1

> (e) To expose a secret or publicize an asserted fact, whether true or false, tending to subject any person to hatred, contempt, or ridicule; or
>
> (f) To reveal any information sought to be concealed by the person threatened; or
>
> . . . .
>
> (h) To take wrongful action as an official against anyone or anything, or wrongfully withhold official action, or cause such action or withholding.

Sheriff Hatcher knew that there was an open investigation into his potential criminal activity. Accordingly, voters could find that when he provided and spread the false accusation regarding Commander Law's and Commander Caughey's use of ammunition, he attempted to influence the testimony of the potential witnesses. The spreading of false information would affect the credibility of the witnesses and subject them to ridicule and hatred for also violating the same policy for which the sheriff was under investigation (appropriating county ammunition). There is a reasonable inference that in spreading a false accusation about the commanders, akin to the crime for which he was being investigated, that Sheriff Hatcher intended to influence their testimony in the investigation and any further proceedings or to attack their credibility, which would affect and interfere with their performance of their official duties.

As to intimidation of public servants, Sergeant Erickson alleges that Sheriff Hatcher also used this threat to attempt to influence the official action of the commanders, who at the time were police officers and, thus, public servants. He

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher,*
No. 98968-1

alleges that because the commanders had a duty to report any crimes committed by the sheriff, he attempted to influence their official action by spreading the accusation and making them fear for their jobs. These facts, in conjunction with the entire context of retaliation and intimidation establish a prima facie case that Sheriff Hatcher did knowingly and intentionally violate the laws of intimidating witnesses and public servants.

Sheriff Hatcher does not make any argument as to the legal sufficiency of these charges but, instead, focuses on facts and alleged political motivations in the present recalls, neither of which we are to consider. Accordingly, the voters could find that these acts amount to misfeasance and a violation of the oath of office.

(b) Charges 21 and 22: May 7, 2020 Intimidating Witnesses

Sergeant Erickson alleges that on or about May 7, 2020, Sheriff Hatcher did intimidate witnesses (Commanders Law and Caughey) in violation of RCW 9A.72.110 during their six-and-a-half-hour meeting.

Consistent with sections 4(c) and 5(a), the allegations from this meeting establish a prima facie case of malfeasance and misfeasance for wrongful conduct that interferes with the duties of the sheriff. For an elected official to threaten jobs of employees who are not "loyal" to the official is a violation of the oath of office and is wrongful conduct.

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher,*
No. 98968-1

Sheriff Hatcher unpersuasively argues that the command staff's employment is within his discretion in that his employees "serve at his pleasure." Appellant's Br. at 29. However, the sheriff who threatens jobs as retaliation and intimidation against those who are witnesses in an investigation against him manifestly abuses his discretion.

(c) Charge 25: June 23, 2020 Intimidating a Witness

Sergeant Erickson alleges that the June 23, 2020 public radio announcement (as discussed in section 4 (c)) when Sheriff Hatcher alleged, on public radio, that Commander Croskrey had "issues with his timecard or accounting for his time," that Sheriff Hatcher's conduct amounts to intimidation of Commander Croskrey in violation of RCW 9A.72.110. CP at 61-62.

Pursuant to the definition of "threat," Sergeant Erickson alleges that the comments were made to damage Commander Croskrey's reputation, allege impropriety, and make the witness believe he was being investigated for time card allegations. When viewed in the context of Sheriff Hatcher's pattern of threatening and retaliatory behavior, this action constitutes substantial conduct. Here, Sheriff Hatcher was aware that Commander Croskrey had made a whistleblower complaint regarding the sheriff's unethical behaviors and his threats to investigate deputies and make them "Brady cops." There is a reasonable inference given the

40

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

entirety of the investigations that the sheriff did intend to influence any testimony

Commander Croskrey may give, thus violating RCW 9A.72.110.

> *6. Illegally made false or misleading statements to law enforcement and the*
> *court regarding the number of firearms he needed to surrender pursuant to*
> *a court order (petition charges 1, 2, and 3)*

Sergeant Erickson alleges that Sheriff Hatcher made multiple false or

misleading statements to KPD in violation of RCW 9A.76.175 which reads,

> A person who knowingly makes a false or misleading material
> statement to a public servant is guilty of a gross misdemeanor.
> "Material statement" means a written or oral statement reasonably
> likely to be relied upon by a public servant in the discharge of his or
> her official powers or duties.

Sheriff Hatcher admitted to multiple employees that while he and his wife

were arguing about his having an affair, he "grabbed [Ms. Hatcher] by the neck

and moved her out of [his] way." CP at 518; *see also id.* at 89. The court granted a

temporary DVPO to Ms. Hatcher and against Sheriff Hatcher, which prohibited

him from possessing weapons. Also granted was an order to surrender weapons,

which required Sheriff Hatcher to surrender all weapons within his possession,

including all weapons on his person, in his vehicle, and in his homes in Kennewick

and Montana.

On October 7, 2019, KPD Commander Chris Guerrero contacted Sheriff

Hatcher to obtain his firearms. At that time Sheriff Hatcher indicated he did not

have a concealed weapons permit and "currently only had 2 firearms in his

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

possession." *Id*. at 128. He further indicated he had two firearms at his Kennewick home and "other" firearms in Montana. *Id*. On October 8, 2019, Sheriff Hatcher turned over one more weapon, a Glock 9 mm handgun.

On October 15, 2019, at a court hearing for the divorce, Sheriff Hatcher's attorney indicated that the sheriff had turned over all of his firearms. However, Ms. Hatcher's attorney indicated that there were still 7 more guns that belonged to Sheriff Hatcher in Ms. Hatcher's Kennewick home. On the same day, Sheriff Hatcher contacted KPD to surrender 5 additional firearms. He also notified them that there were "several" additional firearms at his wife's residence in Kennewick. When KPD went to the Kennewick home, they recovered 10 firearms. *Id*. at 158.

Sergeant Erickson contends that Sheriff Hatcher made false and misleading statements to public servants (KPD officers) when he failed to accurately indicate the number of firearms he had. The voters could certainly find that it is true that Sheriff Hatcher did not disclose a true count of the number of weapons he owned and controlled. They could also find that his statements were false and material and inhibited the KPD officers' ability to obtain all of the weapons as ordered. As a law enforcement officer, he was aware of what was required of him, and he made misleading statements to the law enforcement officer and arguably to the judge. There is a prima facie showing that he violated his oath of office.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Sheriff Hatcher mistakenly contends that because this was a private divorce case, any acts he committed were not "undertaken in his official duties as the sheriff" and the charges should be dismissed. Appellant's Br. at 9. The flaw in his position is that as a public official, Sheriff Hatcher is in a unique position regarding the law. The sheriff, as the person elected to enforce the law, is *always* charged with upholding the laws of the State of Washington. He knew of the court's temporary DVPO and the order to surrender weapons, and he knew what was required to comply with the orders. The voters could find that the sheriff committed misfeasance and malfeasance when he interfered with the performance of official duty by misrepresenting the number of weapons he owned or had in his possession and failed to correct his attorney's misstatement to the court that all firearms had been turned over to KPD. They could find that he also committed an unlawful act when he made a false statement to the KPD officers and/or that these acts were a violation of the oath of office.

> *7. Illegally made false or misleading statements to public servants claiming that he had initiated a criminal investigation into his own conduct when he had not (petition charges 8 and 9)*

Sergeant Erickson alleges that on February 14, 2020, he and Commander Croskrey were public servants with a statutory duty to report criminal activity. He alleges that when Sheriff Hatcher indicated that he would begin a criminal investigation and administrative review, he made a false statement to two public

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

officials in violation of RCW 9A.76.175 (as discussed in the previous section).

Contrary to his statement, Sheriff Hatcher did not begin a criminal investigation. A

reasonable inference can be made that both Sergeant Erickson and Commander

Croskrey relied on this material statement when they did not report the alleged

criminal activity to another party.

Sheriff Hatcher challenges this accusation, stating that Sergeant Erickson

does not establish substantial conduct and that it was a discretionary decision to not

begin a criminal investigation. To the contrary, given the implications that the false

statement involves no criminal investigation of the sheriff's alleged crimes, this

was substantial conduct with no tenable justification. In addition, when the

sheriff's behavior is viewed as a whole, Sheriff Hatcher's repeated attempts to

avoid criminal charges and his belief that his retaliatory acts would prevent

Sergeant Erickson from reporting his allegations to others, Sheriff Hatcher's

behavior constitutes a manifest abuse of discretion given his oath to uphold the

laws and his duty to investigate.

*8. Falsified a public record by placing a false date on an investigation request (petition charge 10)*

In the wake of the conversation regarding Sergeant Erickson's decision to

self-demote, Sheriff Hatcher initiated an administrative review. Sheriff Hatcher

produced a letter dated February 14, 2020 to the Franklin County sheriff with a

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

formal request to initiate an administrative review. However according to the

metadata, the letter he produced was actually created on February 21, 2020.

Sergeant Erickson alleges that Sheriff Hatcher violated RCW 40.16.020, which

criminalizes "falsify[ing] any record or paper appertaining to the officer's office."

The voters could find that Sheriff Hatcher did falsify the letter when he

dated it for a date prior to the actual date the file was created. Although Sheriff

Hatcher claims that it was backdated to when he had the initial conversation, we do

not weigh the evidence. Further, this is not simply an act of changing a date.

Sheriff Hatcher falsified the date on the administrative review of *himself*, which he

sent to his political ally. This act, when viewed in context with all of the wrongful

actions taken by Sheriff Hatcher, is a substantial act. This violation is also a class B

felony and could result in up to 10 years in prison. That the sheriff, who has been

elected to uphold the law, would also intentionally violate it, is substantial.

MOTION TO STRIKE

On October 13, 2020, Sergeant Erickson filed a motion to strike appendix A of

Sheriff Hatcher's reply brief and all reference to the appendix within the brief,

alleging that the document contained in the appendix was not considered in the

record before the superior court. Sheriff Hatcher does not challenge this assertion but,

instead, contends that he was supplementing the record with relevant documents. We

grant the motion to strike the appendix and all reference to the appendix contained

45

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher*,
No. 98968-1

within Sheriff Hatcher's reply brief. *See Nelson v. McGoldrick*, 127 Wn.2d 124, 141, 896 P.2d 1258 (1995) (granting motion to strike portions of brief that alleged facts unsupported by the record and included evidence not submitted to or considered by the trial court).

CONCLUSION

We affirm the superior court and find that all of the charges are legally and factually sufficient. Recall petitions are read broadly, as a whole, and in favor of the voter. The recall petitioner has alleged facts that, when viewed through that lens, establish a prima facie case of misfeasance, malfeasance, and unlawful conduct for each charge made against Sheriff Hatcher, for which there is no reasonable justification.

Accordingly all eight charges contained in the ballot synopsis may proceed to the voters.

*In re Recall Charges Against Benton County Sheriff Gerald D. Hatcher,*
No. 98968-1

_____
Whitener, J.

WE CONCUR.

_____
González, C.J.

_____
Stephens, J.

_____
Johnson, J.

_____
Gordon McCloud, J.

_____
Madsen, J.

_____
Yu, J.

_____
Owens, J.

_____
Montoya-Lewis, J.